I represent Hector Cirino. I'm going to be speaking first on the one shared issue between the two briefs, the defendants' briefs, and that is whether Puerto Rican convictions count as career offender predicates under the United States Sentencing Guideline. We intend to reserve four minutes of our time for rebuttal to be shared between the two of us, both co-defendants' counsel. This is a very simple issue. If you have my opening brief, if you look at the back, there's an addendum that has the operative career offender language on addendum, page 17. 4B1.2 defines what convictions count as career offender predicate convictions, and it says the term crime of violence means any offense under federal or state law. So this appeal is about whether or not federal or state law means territorial convictions. In the government's 37-page answering brief, in this case, in my case, the single-issue brief, is all about convincing this Court that the word state means territorial convictions, specifically Puerto Rican. But it simply does not say that. There's, and time and time again, in different congressional statutes and, indeed, even in the career offender precursor, the special offender statute, the statute specifically defined what state means. For instance, in the old special offender statute, this is the old 3575E, which was abrogated and replaced by the Sentencing Reform Act in 1984. What it says, what it said was the defendant has previously been convicted in courts of the United States, a state, the District of Columbia, the Commonwealth of Puerto Rico, a territory of possession in the United States. Now, if state means Puerto Rico, why does this statute, and, indeed, many other statutes, and even parts of the guidelines, why does it define the Commonwealth of Puerto Rico to be a separate concept from the concept of state? The government's argument seems to be that if Congress, or in this case the Commission, defines the concept of state to mean Puerto Rico in enough statutes, that when, forevermore, when they say the word state, they mean Puerto Rico. Well, that clearly cannot be the law. And it specifically cannot be the law in this context when we look at this in the, under the statutory canons that the Court is obligated to follow here, and which is, in a penal context, penal statutes are to be construed narrowly. And I look, one of the most illustrative quotes is from a decision from this Court, which is quoted on page 10 of my opening brief. United States v. Napier, Ninth Circuit, 1988 case. It has long been settled that penal statutes are construed strictly and that no one is to be subjected to a penalty unless the words of the statute plainly impose it. Here we're talking about a 200-month swing. Serino says nothing more than the basic intention that before he is subjected to a 200-month enhancement, the statute, or in this case the guidelines, should clearly state that, plainly. Here, the Commission uses words of limitation. It says it has to be a Federal or State conviction. Now, we know the government can't come up here and say that, well, foreign convictions can count or tribal convictions can count. We know clearly that that is not the case because they have to be countable, and the guidelines say that foreign and tribal convictions can't be countable. We know that these are words of limitation. Now, the government and both the district court rely on the fact, well, in Puerto Rico you're afforded these constitutional protections. So we have an adequate constitutional scheme in Puerto Rico, therefore, the convictions should count. But that can't be the analysis. Nobody is up here, the government is not going to come up here and say, well, Finland convictions count, even though that's not a Federal or State conviction, because in Finland they afford people probably greater constitutional protections than we receive in the United States. The adequacy of the jurisdiction's constitutional protections is not the inquiry here. It can't be the inquiry. But it's the inquiry that the district court relied on. I mean, it's the mode of analysis the district court relied on. It's also the mode of analysis relied upon in the First Circuit case, Morales-Diaz. Now, Morales-Diaz, you know, is not, although it's a persuasive authority, it shouldn't be binding on this Court for a couple of reasons. For one, not only does the Morales-Diaz opinion say that this was not raised in the district court, so we don't want to consider it, but it also says that it wasn't even argued on appeal, that he presents no developed argumentation to this Court on appeal, is what the opinion says. And then it goes on to say, well, Congress gives the Commonwealth of Puerto Rico all these rights, and that Puerto Rico has been treated as a State in other contexts. But not, this is what the First Circuit opinion says, but not in the penal context. Why is that significant? Because there's this case law from the United States Supreme Court, from this Court, that says there's a different canon of construction that applies in that context. And that is that it cannot be a guess. It's intended. Here it is no more than a guess. You're trying, what the government wants this Court to hold is that State means the Commonwealth of Puerto Rico. What the government wants this Court to do is fill a gap, what they, what is a perceived gap in the guidelines. Well, that is nothing more than judicial activism. And it's judicial activism at its worst. It's not the traditional judicial activism that the, that conservatives dislike, where we're saying that constitutional protections give people a bubble of protection that the government can't evade. Here they're asking the Court to say that a statute says something that it does not say, that it has an expansive scope, a criminal statute has an expansive scope, and that we want you to fill that gap. What was the crime of which he was convicted in Puerto Rico? Well, Your Honor, it's not entirely clear from the PSR, and if you look at the amended PSR, the one that was revised on November 21, 2003, if you look at the convictions, and they are described in paragraphs, the ones that we are concerned with, on 33 and 34, the first one, although it's, the parties assumed it was a bank robbery in paragraph 33, it talks about robbery, receipt of stolen goods, so on and so forth. Now, robbery is a crime of violence. And we're not saying it doesn't meet the definition of crime of violence, aside from the jurisdictional word of limitation language. Was he prosecuted in the district court in Puerto Rico? Not federal district court, in the Puerto Rican state system, which is another interesting point. One thing we don't know here is why did the Sentencing Commission put those words of limitation in the guidelines? The government has supplied no legislative history, or I should say commission history in this case, to help us decide that. I couldn't find any. But one reasonable thing to posit is that it's difficult to evaluate foreign convictions. And in this case, we had that concern that documents were received from the convictions in 33 and 34, the challenge convictions, were in Spanish. And we know that the Puerto Rican state system is not a traditional common law system like we have in the States. It's a hybrid system that's civil and common law in nature. It's a different system. So a reasonable basis for the commission to say we aren't going to include foreign convictions, we aren't going to include convictions from jurisdictions other than from the States and the federal government, is that it's difficult to evaluate those convictions. And it's a reasonable basis for doing it. And it can't be, the decision can't be based on what the district court said, which is that, well, they give people a lot of rights in Puerto Rico. I mean, that's not really responsive to the inquiry. They give people a lot of rights in Western Europe, but we know we can't count those convictions. We know we can't count them because it says federal or state. The government's not going to get up here and say that a Belgium conviction counts because it's not a federal or state conviction. How do you think we ought to deal with this issue in light of Booker and Phan Phan? Well, Your Honor, it's a prior conviction exception would be the simple answer to that. I mean, we're talking about enhancing a sentence based on prior convictions. It seems to fall pretty squarely within the apprentice prior conviction exception. Now, if they threw out the entire guidelines, then we could be, I mean, all bets are off in that case if that's what happens. But it seems that I didn't feel like I had a Booker or Phan Phan issue because of the prior conviction exception. It still seems to be the law. But I want to let my opposing counsel speak now. That's a good question. Good morning. May it please the Court. I am Melinda Simpkins, and I represent Ivan Gonzalez Corporan in this matter. As Mr. Carr indicated, our first issue really deals with the career criminal provision and definition of crimes of violence. And the basic, in a nutshell, argument is the plain language of the crimes of violence requires that the prior crime be an offense under State or Federal law. And given plain language and strict construction, Puerto Rico is not a State, and therefore, Puerto Rican convictions cannot be used to trigger the career criminal provisions. Now, other guidelines and statutory provisions, in my view, are not contradictory to this position. For example, the background note to 4A1.1, it basically just gives a list of the prior convictions, allowing subsequent guidelines to pick and choose from this list. Now, the background note also is not a mandate. It doesn't say that prior convictions shall include or must include. It indicates that prior convictions may include. And certain convictions from this list are never counted. For example, as Mr. Carr said, foreign convictions aren't counted. Some military convictions aren't counted. Tribal convictions aren't counted. But then you turn around and you look at the armed career criminal statute and guideline, which indicates that any conviction is counted. Particularly telling, though, is the repeat sexual offender provision, which specifically defines the word State to include Puerto Rico. Now, if the term State was automatically included or inclusive of Puerto Rico, then that kind of makes that definition superfluous, and it also makes the listing of territorial convictions in 4A1.1, the background note, superfluous. The congressional definition in the repeat sexual offender provision indicates clear congressional intent to include Puerto Rican convictions for that statute. It also indicates that Congress knew how to broadly define the term State and that they didn't do that in the career criminal provision. They intentionally left it up to the commission to define crime and violence. Now, the First Circuit law is not instructive on this issue, particularly Morales-Diaz. If you look at that decision, the Court is basically telling the defendant that, look, you know, you failed to raise this below. This is a plain error review. You failed to fully argue it. You failed to cite it. They don't quite say that, though, although I think it's they should have. But they didn't say it's a plain error review, did they? They said it wasn't raised below, and then they dismissed the argument without saying what standard of review they applied, right? Let me take a look. Of course, the importance of the First Circuit is that Puerto Rico is on the First Circuit, so. That's true. And I don't have the page number. I know on my copy it's paragraph 37, but the Court indicates that the two remaining claims of legal error, and I believe the sentencing issues were one of those, were not raised by the defendant below and are therefore subject to the plain error standard of review, but be that as it may, the First Circuit actually is saying to the defendant, you didn't fully argue this issue, and so we're not going to decide it. So the fact that the Court didn't decide that issue really doesn't set any precedent. And then along comes the Torres-Rosa decision. Kennedy, I'm sorry, but pardon me, counsel. The Court says that the defendant's argument, quote, completely ignores the body of case law recognizing that Congress has accorded the Commonwealth of Puerto Rico the degree of autonomy and independence normally associated with States of the Union. So it isn't saying we're not going to consider the argument because of plain error. It specifically recites a basis for rejecting the argument, correct? Your Honor, at the end of that paragraph, the last sentence is, we thus declined to address it. So I'm taking that as meaning they're not going to address the issue because counsel didn't make any. So this is just all dicta? That's my opinion. I believe it is all dicta because, as they clearly say, they declined to address the issue. Then along comes the Torres-Rosa decision, and basically Torres-Rosa makes two mistakes. First, it relies on Morales-Diaz as making — having made this decision and set precedent. And secondly, it places the burden of proof on the defendant, which, as we know, goes against longstanding precedent in this circuit. So — and neither one of them really went into any detail as to how they reached their decisions. The government, as an alternative argument, also asserts that because Puerto Rican convictions in this case were for bank robbery, which is also a Federal crime, then the convictions count because the conduct was an offense under Federal law. Now, this is an attempted analogy to the controlled substance offenses, which Congress went ahead and specifically defined in the Enabling Statute 28 U.S.C. 994h. Congress indicated that when you're looking at a controlled substance offense, you look at the overall conduct of the underlying offense to see if it meets the specified Federal definition. However, as to crimes of violence, they left it to — intentionally left it to the sentencing commission to decide. And the commission indicates that you look — you're not looking at the overall conduct, you're looking for a specific element, the use of force is what you're looking for. So one — these two are not interchangeable. One is very broad in that you're looking at the overall conduct, and one is very narrow in that you're looking just for one specific element. Excuse me. So also, the thing to remember is that the commission had the Enabling Statute in front of it when it drafted the definition for crimes of violence, and if they had intended to make these two interchangeable, it would have been very easy to put in the described-in language that's in the controlled substance offenses. So as for the congressional directive that punishment for repeat offenders should be at or near the statutory maximum, just keep in mind that the position I'm advocating today is not going to have a widespread application. And I don't really think it's inconsistent with this congressional mandate, because even with this mandate, foreign convictions are not counted. And Puerto Rican convictions are more like foreign convictions than they are State convictions. And that's, as Mr. Carr said, really the basis of the law is different. It's not — it's a hybrid system. It's not totally based on English common law, but it's — it's, you know, has the Spanish undertones to it. The — there's also the language. Kennedy, can't the same thing be said about Louisiana law? I'm sorry? Can't the same thing be said about Louisiana law? It has Napoleon behind it. I was going to say wrong country, but same concept. Same concept, yeah. There's the — but Louisiana law, you're not going to have the language barrier, too. There are other things on top of this that we need to consider. We've got the language barrier, the translation. There are going to be different connotations, and sometimes, you know, things are lost in translation, I guess is what I'm trying to say. Do you want to get to your other issues? You only have about five minutes left. Okay. I will hit those real quick. The revocation hearing, my basic position is, we know the due process applies to the revocation hearing. On the face of the documents that we presented to the Court, it doesn't indicate that my client was present or represented by counsel. And at other revocation hearings he had been to, it clearly represented that he was represented by counsel. And we know the district court plainly got it wrong in that they indicate — or that the judge indicated that, you know, there's not a right to counsel at a revocation hearing. There's a statutory right to counsel in the United States, and as the government concedes in Puerto Rico, there is a right to counsel at a revocation hearing. The records clearly on the face don't indicate that my client was present, and the service on the document that when the district court found that he was served at the time, I don't really think — I kind of — I have to disagree with that, because that would mean that somebody sitting there typing up the document, having it signed, having it copied, having it filed, and handing it out, all right there. And that level of efficiency is just not — not done. I'll reserve the rest, and for the rest of the arguments, I'll submit. Thank you. Voskes, I'm an assistant U.S. attorney in the District of Nevada. It's my privilege to represent the United States here today. And I'd like to begin by noting that this case, at least the arguments concerning Puerto Rico, have now come full circle. If you go back through some of the documents that have been submitted, what you'll find is the original objection advanced by defense counsel was that Puerto Rico, it's a foreign country. In fact, in the original objection, they equate Mr. Serino with how can he be distinguished from a Mexican national who's going to languish in our jails for such a long period of time. Well, I don't know if it's an alibi or a confession, but let me begin by noting that I moved to the District of Nevada last August. Previously, I spent four and a half years as an assistant U.S. attorney in the District of Puerto Rico. And when people compare Puerto Rico to a foreign country — So when this prosecution came, they said, that's our man, right? When this prosecution came.  All right. Well, maybe you can help us out on interpreting Puerto Rican law, because the difficulty I see analytically, leaving aside all of the statutory construction arguments, is usually what we do when we try to find, determine whether conviction constitutes a crime of violence or otherwise meets the guideline definition, we use the Taylor analysis. We look at the statute and see if it fits with the elements. And then we get down, if that fails, we get down to the pre-sentence report and the consular documents. Can you tell us, in terms of what happens in the State or the territorial courts of Puerto Rico that would give us the same level of confidence that we have in the States to do that analysis, given the language barriers and so forth? All right. First, in terms of the confidence, I would note that the local courts in Puerto Rico are subject to constitutional mandates as any other local courts are. I'm not — I'm not federal review. What I'm talking about is something different. I'm talking about the ability to look — when we're dealing with State judgments, we have a well-developed body of law that apply to those. We can analyze those. We can look at the PSRs. We can — we have a fairly, you know, we have a lot of information. We have less so, at least, in my limited experience with Puerto Rico. So I'm asking you in the general matter, can you explain to me why you think, based on your experience in Puerto Rico, that we should have the same level of confidence in the judicially noticeable documents? Well, let me first begin with an observation, and I'll try to address your question. The observation is it's not only Puerto Rico that's in play here. Sure. By defendants' reckoning, the District of Columbia is also not a State, and therefore, convictions out of the District of Columbia courts won't be counted. Right. And we have the — yeah, and we have the — obviously, the territories in our jurisdiction. Yes, Your Honor. In Puerto Rico, the language in local courts is indeed Spanish. In fact, in the Federal courts, I can attest that probably 80 percent of the testimony is in Spanish language and translated. It's routine for documents to be translated, and that includes records of convictions from local courts. Now, in this case, probation, just as they do in Puerto Rico or just as they do with local courts in Nevada or Idaho, they received the records from the local convictions. Those records showed that the two defendants in this case, on two prior occasions, had gone into banks, carrying guns, and robbed those banks. Now, they weren't charged federally. They were charged under the State statutes with firearms offenses and with robbery. But you read through the charges and you read through the convictions, and that's what they did. The analogy is to the Federal bank robbery statutes. Therefore, Your Honor, it's a violent crime. That wasn't disputed below. And this is something, and this may be anecdotal, but routinely in Puerto Rico, you see these type of records coming into Federal courts and the Federal judges making determinations of criminal history based on them. Well, in the territorial courts of Puerto Rico, for example, are pre-sentence reports typically prepared as they would be in the States and the United States here? In terms of the local courts? I'm just asking about the mechanics of this. I am not a member of the Puerto Rico bar, so that's my alibi. You led with the line of Puerto Rico, so I was counting on you to give a submote. But in the Federal district court there, they will take those records, those convictions, and assimilate those into a Federal recommendation or probation, a pre-sentence report. Right. Well, based on your experience there, even though you're not a member of the bar, can you tell me what you would have viewed as the judicially noticeable documents that would come out of the territorial criminal courts in Puerto Rico? To be used in the Federal courts here. Routinely, what you will see, as you did in this case, is you will get certified copies of the convictions and copies of the charge sheets. And those will come – Puerto Rico is big on formality, so they'll often come with stills or seals or stamps or something else. But they're certified court records, like I believe you would obtain from any other local court. So I'm not sure if that distinction and the Spanish-language barrier that they talk about, that's something that the Puerto Rico courts and other courts throughout the country are dealing with every day. That's not an obstacle. But what I would point out is that Puerto Ricans are American citizens. And part of the purpose of Congress in passing the Enabling Act for the Career Offender Statute was to ensure that recidivists are not a threat to society, to protect the citizens from these career criminals. By defendant's reckoning, a defendant can commit murder, can commit bank robbery, can commit whatever he wants in D.C. or in the U.S. territories, and then walk into a Federal court in that same district, and he's exonerated. He's absolved of his prior criminal past. And the question that came to mind as I listened to counsel was, why? Why on earth would the Sentencing Commission intend this result? And I credit him. He said, well, I'm not here to answer why. He's here to play semantic games. But I can't stress this Court enough that this is more than a game of Scrabble. What we have to do is to say, well, that's all true, but Puerto Rico doesn't want to be a State. They are not a State. And the statute says State. The statute doesn't. Well, let me address that. Because what we're talking about here is the sentencing guidelines and the statute. And what was Congress's mandate? That's in 994H. The statutory mandate to the Sentencing Commission was the commission shall assure that the guidelines specify a sentence for term of imprisonment at or near the maximum term authorized for categories of defendants 18 years or older, convicted of a felony as a crime of violence, and they've previously been convicted of either, A, a crime of violence, or, B, specified Federal drug offenses. Now, in Rivera, this Court dealt with that issue. But when they talk about a crime of violence, there's no jurisdictional limit. They didn't say leave out Puerto Rico. In fact, if you go back to the historical statutes, Puerto Rico is specifically included. Here they talk about a crime of violence without any sort of jurisdictional limitation. Now, Appellant's argument, and I note that, as the First Circuit noted, Puerto Rico is routinely included within the definition of State. You can go through the Federal Criminal Code, and I'm at a loss to find any sort of statute, including, interestingly, RICO, in which Puerto Rico conviction can be a predicate for RICO sentence or RICO conviction that treats Puerto Rico any differently. In fact, in the Federal Rules of Criminal Procedure, State is defined to include Puerto Rico. Appellant's argument comes down, well, they didn't define it again in Chapter 4. That's true. But I'd point out that as a Supreme Court ---- I mean, they have a fairly good structural argument that if you specifically define it in one section and you don't define it in the other as concluding Puerto Rico, there's a negative inference that arises. So it may be, as you say, an illogical assumption, but on the other hand, I think they've got a fair statutory argument, or, well, plain language argument in the Guidelines. If you view this section of the Guidelines in isolation, in a vacuum, with blinders on, then their argument makes perfect sense. Kennedy. But he's not looking at it in a vacuum. He's ---- Judge Thomas is putting you the case where it's mentioned, Puerto Rico is mentioned in other portions of the Guidelines, the same document, but not mentioned here. Phillips. Indeed, it is. Kennedy. Shouldn't we take that as an indication that they don't mean Puerto Rico to be a State? Phillips. I don't believe so, because, first, I begin with the canon of statutory construction, that you have to construe statutes in their language in the context of the overall statutory scheme. And so I think you have to read the sentencing Guidelines in their entirety together to form a cohesive whole. Now, when you do that ---- well, before I even do that, let me note that another of the mandates of the sentencing Guidelines is to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct. That was one of the goals of the sentencing Guidelines. As we assess it and interpret it, I ask you to bear that in mind. But anyway, let me talk about their argument. Their argument is that it's not defined in Chapter 4. The sentencing Guideline defines State elsewhere. That is in Chapter 2, but they don't repeat that in Chapter 4. Now, at page 9 of his reply brief, Appellant Serino tells us that, and he quotes part of the statute or part of the Guideline application notes, that tell us the definition of the terms, and this is in 1B1.1,  And if you were to take that at that point in time, you'd think, well, they define State here. Over here, they don't. We're at a loss for what to do. But it goes on. He doesn't quote this part of the language. It goes on and reads, Therefore, their applicability to sections other than those expressly referenced must be determined on a case-by-case basis. Now, we're not talking about some sort of different offense here or element of an offense. We're talking about the simple term State. That's defined as why the sentencing commission to include the District of Puerto Rico and the District of Columbia. Now, what is there that would tell us that they meant anything different when they use that term later on? There's nothing. Because, in fact, if you look at 4A1.1, it tells us the convictions can include and they use the word the 50 State systems, not just States, but they use a qualifying language, the 50 State systems, the District of Columbia, as well as the territories. I think their language is telling, because they're telling us when they mean the 50 State systems, they use the 50 State systems as opposed to simply saying States. But what's more, they're also telling us that sentences from the territories count. They count in Chapter 4. Now, Appellant Serino, at page 10 of his brief, his reply brief, makes a startling admission. He argues, and I quote, that the sentencing commission chose to define a prior conviction for purpose of 4B1.2 as a, quote, Federal or State conviction, end quote, but chose to include convictions in the Federal system, 50 State systems, the District of Columbia territories, end quote, for purpose of 4A1.1, demonstrates the commission excluded Puerto Rican convictions by deliberate choice. Now, think about that. What he's telling us is there's a dichotomy here. Puerto Rico convictions can count in assessing criminal history under 4A1.1, 4A1.2, but you don't count them in a career offender status. That's slicing the case mighty thin. And one of the problems he has with that is the guidelines tell us otherwise. Because the guidelines themselves tell us, and I quote the commentary to 4B1.2 that expressly provides, quote, the provisions of 4A1.2 are applicable to the counting of convictions under 4B1.1. You turn to 4A, it tells us that convictions can include anything not otherwise excluded. It specifically tells us they include territories. There are elsewhere exclusions for foreign convictions and tribal convictions, but territories are never excluded in 4A1.2. You can't separate them. You've got to read the guidelines in their entirety, in Chapter 4, at least, in its entirety. And what you find is that Puerto Rico convictions, District of Columbia convictions, convictions in Guam for violent crimes are to be counted both for criminal history and for career offender status. The guidelines don't make the distinction that Appellant does. Now, I also note in my brief that even if you were to accept their interpretation and there I cite Rivera, rely on the logic of the Rivera opinion dealing with 994-H, the Enabling Act, that bank robbery is a Federal crime. It's a Federal offense, even in Puerto Rico. Now, the fact that it's an accident of fate that they were prosecuted locally rather than in the district court of Puerto Rico, that happens. But as in the D.O.A. Kennedy, I'm sorry, Your Honor. Kennedy, If it happened on a reservation and it was a tribal prosecution, theoretically, if then that would be a different story, wouldn't it? It would be an interesting problem. I mean, doesn't the fact that Congress has excluded all judgments from tribes and I realize that they have different, there's limitations on their criminal authority, tribal court, but still, the fact that you're excluding all, all either on Indian reservations, doesn't that cut against your argument that Congress intended uniformity throughout for all citizens of the United States? No. Well, it would undercut my argument with regard to the sentencing guidelines without the next argument, which is if this is the construction of the sentencing guidelines, then it violates the congressional mandate. Because Congress didn't say you can't use violent crimes from Indian or tribal courts. Congress didn't say you can't use violent crimes that have to be defined under Federal law. Congress didn't say anything about any jurisdictional limit on the violent crimes. Because think about it. As a matter of common sense, does it really matter if the mass murder was committed on Indian country or in the District of Columbia or in Puerto Rico? Does that mean that you can't consider that violent offense? Now, they put some qualifying language on the drug side of that because there are all sorts of drug offenses out there and they wanted to make sure that they met some sort of test. The test set out in Title 21 and Title 46. They didn't do that with violent crimes. Because if you've been committed with a felony violent crime, whatever jurisdiction it is, you deserve to be treated as a recidivist if you meet the other criteria under 994H. So and this goes well beyond the case before us. And the question was raised earlier. What about Western European convictions or convictions from other places that recognize people's procedural rights? That's perhaps an argument for another day. But if you look at the statute, there's no exclusion. Nobody's gone that far. Nobody's gone that far. And I'm not advocating that today. But I think that's a very tough argument to make that they – that if you're arguing that that's the statutory breadth and we intend to. I agree to you. I agree with you. And I rely in that partly on the history, because if you look back at the preceding statute that was replaced in the Sentencing Reform Act by the career offender statute, it dealt with U.S. territories. It dealt with the States, the District of Columbia, and U.S. territories. So I think historically, that was Congress's intent. And I believe that was their intent in 994H. But I leave you, though, with a final thought, perhaps repeating myself. Look at the mandate that the Sentencing Commission was given. It was given a mandate to make sure career offenders, people over 18 who have been previously committed of a crime of violence or two crimes of violence, get sentences near the statutory maximum. There's no ambiguity in that. Congress's message was clear. And they also gave a mandate to the Sentencing Commission, make sure you treat people equally who are – who have the same criminal history. And the fact that these individuals were convicted in Puerto Rico or in Puerto Rico local courts versus the District of Puerto Rico's courts doesn't really change the nature of their crime or their recidivist impulses. Because this is a classic example. They go out and commit a bank robbery together. They're released on parole. What do they do? Within seven or eight months, they commit another bank robbery. They get out on parole. This time, they have themselves for a while until they hook up again here in the District of Nevada, or there in the District of Nevada, and commit yet another bank robbery. But that's my presentation on the first issue. If there are any more questions, I'll be happy to entertain them. Otherwise, I'll touch briefly on some of Gonzales' – Appellant Gonzales' other arguments. Let me ask you about Gonzales Corcoran. Is there sufficient evidence to convict him of armed robbery? Your Honor, I believe there is. And I went through some of the opinions and decisions cited by Appellant Counsel. And what you find are in cases where this Court has ruled otherwise, it's sort of the same getaway car. Well, he was outside. But here, the prime bank robber, the person goes in and gets the money, the person climbs over the counter, the person who's being assisted, who's benefiting by the protection of the gun, is Defendant Gonzales. Now, a jury, looking at the evidence and looking at these stills from the videotape, frame by frame, it's clear that there's concerted action going on here. And I submit to the Court, the jury could have found otherwise. But the jury made the inference in this case, a permissible inference, that they knew what was going on, that this was part of a common plan. There's nothing in the evidence that shows that he saw the gun, knew it was going to be used, or that there was any planning. I mean, it's just a lacuna in the evidence. I understand that, Your Honor. And in fact, I suppose if you take the defense or the appellant's argument to his I couldn't prove to you that he saw it outside the bank, that he knew he was going to bring it with him into the bank. But a jury is entitled to make inferences, because I wish I had an instance of the photograph that was introduced in evidence of Mr. Gonzales Corporan leaving the bank and Mr. Cedino inside the bank. Could that not be found since Mr. Gonzales Corporan was coming from the teller's bank, teller's area? Could one not conclude from that that Gonzales saw the gun being used by Cedino? He might have, but the testimony on that point is probably to the contrary, because I believe it was on cross-examination that Ms. Simpkins asked the witness who said that as she was trying to watch Gonzales leave, she saw Mr. Cedino show her the gun and tell her not to do that. It was her recollection, at least on direct or rather on cross-examination, I believe, that he may have been past him by the time he showed the gun. So I don't believe I can make that argument. But what I made the pitch to the jury, and I make the argument again here today, is a jury can infer from his conduct through there that he was there for a purpose, and that purpose was to do exactly what he did, to show the gun when necessary to coerce compliance with his and Mr. Gonzales' demands. Now, you didn't charge conspiracy, did you? No, it was not charged. And so the proof of the armed part of the case is much more difficult for you than had you charged conspiracy. As I noted earlier, I got to the district in August of last year. So I understand that, but ---- Our cases are very tough on this. I was surprised, but Corcoran seems to suggest that you have to have concrete proof that the individual had knowledge and ---- I, and again, commenting on those cases, I think the facts are different. But I wish, or maybe I don't wish, that somebody would invent a box that you can put somebody's head in and see what they're thinking, what were their intent. But we don't have that. What we have are juries, juries that look at the facts, juries that look at the circumstances. Well, the question is whether there was evidence sufficient to go to the jury on that issue. And I submit to the Court that there was. That is, although these cases ---- It has to be, it has to, the question is whether they are allowed to draw that inference, isn't it? I understand. And I believe that there was enough evidence for the jury to draw that inference. What is the evidence that Gonzales Corcoran knew that Serino had a gun? It comes to the totality of what went on that day. Not the totality, but where's the evidence? I mean, the fact, the fact, there's no question that there's sufficient evidence for an unarmed robbery. Let's put that to one side. But where's the evidence that Gonzales Corcoran knew that Serino had a gun on him? I'm hard-pressed to answer that, because you don't want me to talk about the totality of the evidence. I understand you're looking for some direct evidence. Well, the totality of the evidence, if it shows that, but tell me what portion of the totality of the evidence shows that. Well, what the evidence shows is that they did this as part of a common plan. And Mr. Serino didn't go into that bank as a spectator. He went in there with a purpose. His role was to maintain security and maintain control of the bank. That's the inference a jury can make. Well, but that can be done by fists or knives or other things than a firearm can. When you're trying to control however many people are in the bank, I submit to you that a weapon is necessary. Right. Well, not necessarily. I think the question really is, you seem to be arguing that any time anybody brings a gun into a bank, that it's a strict liability for all the other people involved in the robbery, right, as to armed bank robbery. My – I don't believe that that's what I'm saying. What I'm trying to say is that you said – basically, your argument is one of the participants brought a gun in, therefore, the other must have known about it because they were working together. That's your best argument. I suppose so, yes. Yeah. He was the beneficiary of that. Now, let me ask you a question about the shoe print, if I might. Just – Yes, Your Honor. When I went – when I was reading the transcript, there seemed to be a – it was obviously a very late disclosure. But the defense counsel, I thought, made an objection that the government had known about that since April, or long before trial. When did the – when did this come to the attention of the government? The FBI, I believe, did receive a report from Las Vegas Metropolitan Police. It may have been April or early May. It was sometime in that time frame that they received a report from the crime scene analyst indicating that he had collected a shoe print. Now, that, for reasons I go into a little bit in my brief, didn't get passed on to the prosecutor, or at least if it did get passed on, it was misplaced due to an injury. I'm not sure which of those would be the case. But the government did have some place in its files that information as of April or May. Okay. Thank you. Regarding the issue of the difficulty in obtaining Puerto Rican records, it's interesting or illustrative to note on excerpt of record, page 11, the government, if you look at the minutes, was trying to get in 440B evidence on these prior convictions and wasn't able to do so, at least in the meaning of the case. Why? Because, as Mr. Vasquez represented, he wasn't able to obtain certified copies of the convictions. He had difficulty obtaining copies of the convictions. Also, in the amended PSR, which was done after the objections were raised to the Puerto Rican predicates, paragraph 33 in the PSR, once again, we have no information about paragraph 33. Why? Because no information was able to be obtained by the Office of Probation. It's difficult to get these records, which is important. And it is important to be able to get the records and be able to evaluate them cogently under a Taylor categorical approach. So, do you agree that the District of Columbia is in the same position as Puerto Rico? Right. Well, no, I don't. The one crucial difference, if you watch the Olympics, the District of Columbia does not have its own Olympic team, unlike Puerto Rico. Would they be, Congress has plenary power over the District of Columbia. That'd be a separate issue. It's a lot more of a stretch to say State encompasses Puerto Rico than it does the District of Columbia. If that — if I was here arguing the District of Columbia case, I'd be in a more difficult position, I would say just based upon how expansive — the question here is how expansive are we going to define this term State? It's one — it's one step to say, well, it encompasses the District of Columbia. It's a different step to say it encompasses the Puerto Rico — the commonwealth of Puerto Rico, which has — is more foreign in nature because it has a different court system, unlike the District of Columbia. Now, one thing — Columbia has a superior court also. They do have their own court. I've never seen — had an issue with a conviction coming out of the District of Columbia. Now, one thing, the First Circuit case, I would — if you read it, the Morales case, it does clearly sound in plain error. It does look like plain error, but — It does, but the analysis that they say, they say Puerto Rico has been treated as a State in a variety of contexts, and they list these contexts, States for purposes of sovereign It's one thing to give the concept of State an expansive definition when you're talking about the rights of the Puerto Rican government and the rights of citizens. It's quite another to use a — to give the concept of State an expansive definition when you're talking about construing a penal statute. Now, why? Because we have all these cans that say penal statutes are to be construed narrowly. And it's interesting, in the government's brief, they say, well, the First Circuit case is their — it's plain error, but, you know, there's no difference between plain error and de novo, which is interesting. It's the first time I've ever heard the government tell me that, that there's no difference between plain error and de novo. I'd like to have them say that in my plain error cases. There certainly is a huge difference. In the First Circuit case, if you read the flavor of it, it seems to be almost solely predicated on the plain error analysis. So this becomes an issue, almost a first impression for this Court, a very important issue, and I would urge the Court to — to find that the language of the sentencing guidelines just doesn't support the way the government would put on it. Thank you, counsel. Very briefly, I'm going to hit the sufficiency of the evidence issue and the discovery violation. As you correctly pointed out, there was absolutely no evidence of any kind of robbery preparation. The only witness they had was Teresa Padron, who indicated she loaned her car to Serino, but she didn't see my client that morning. The gun was under Serino's shirt throughout the whole robbery. My client never referenced the gun. He never threatened the tellers with the gun, and he took control of the bank by jumping over the counter. There was no ever any indication that he knew about that weapon. Serino flashed the gun after my client had already jumped over the counter, and he did it to a woman who was sitting three to four feet away. She was the first person in the whole entire bank to notice the gun. And as you pointed out, you can see by the photos, my client's back was to Serino as he was headed out the door, and so that's when Serino walked forward and flashed the gun the second time in the bank. So my client couldn't see that. The gun was extremely well hidden, even after the robbery, the pat-down search. Kennedy. Are you saying that you admit that the record shows that Serino flashed the gun twice, once when Gonzales went over the counter and once after Gonzales had left? I believe the record does show that, Your Honor. He flashed the gun at the teller three to four feet away, which is in the first volume, page 92 to 93. And then there was a second testimony that Serino drew the gun while my client was headed out the door, and that's at page, I believe, 109 through 111, and again at 119 of the first volume. But again, the gun was very well hidden even after the crime. So a police pat-down search didn't even find it, and they wouldn't have found the gun. They didn't find the gun until Serino actually sat down, so it was very well hidden. And the only fact that the government can establish is that they were working together. And if you carry that to its logical conclusion, like you pointed out, everybody that's involved in a bank robbery, where a gun is involved, is going to be liable for that gun, and that's goes against our precedent. Discovery violation, very quickly, eleventh-hour expert witness. I had absolutely no notice of it. They had the evidence. They took the evidence on the date of the robbery, and so that evidence was available to the government, even if the government didn't have it in its file at the time. Identity wasn't issued because none of the witnesses made an in-court identification of my client. One of them actually identified a court interpreter as the person who was jumped the counter. So it was pivotal to my case, and I really had no option or no opportunity to rebut that. Wasn't there a lot of identity evidence in the photographs? I'm sorry? Wasn't there identity evidence in the photographs? There was identity evidence in the photographs, and I know this seems kind of a contrary position that I'm arguing, but I would still argue it to a jury just because there is a conflict of the evidence there. I mean, they couldn't identify him in court. I think I would give you credibility with a jury to say the hat didn't really show his footprint when here's his photograph. The photograph, but you'll learn in the photograph the guy's wearing a hat and sunglasses. They didn't produce the hat. They didn't produce the sunglasses. The guy's wearing a watch. They didn't produce the watch. So they had nothing other than a plain gray.
judges: B. Fletcher, Thomas, Bea